

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-16-1999

# USA v. Stansfield

Precedential or Non-Precedential:

Docket 98-7233

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Stansfield" (1999). *1999 Decisions.* Paper 64.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/64

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 16, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No.: 98-7233

UNITED STATES OF AMERICA

v.

MERRITT G. STANSFIELD,
        Appellant.

Appeal from the United States District Court
For the Middle District of Pennsylvania
D.C. No.: 94-cr-00138-1
District Judge: Honorable James F. McClure, Jr.

Argued: January 27, 1999

Before: BECKER, Chief Judge, SCIRICA, ROSENN,
Circuit Judges

(Filed March 16, 1999)

        Thomas C. Carroll (Argued)
        Carroll & Cedrone
        6th & Chestnut Streets
        Public Ledger Building, Suite 940
        Philadelphia, PA 19106
        Counsel for Appellant

        Theodore B. Smith, III (Argued)
        Office of the United States Attorney
        Federal Building
        228 Walnut Street
        P.O. Box 11754
        Harrisburg, PA 17108
        Counsel for Appellee

OPINION OF THE COURT

ROSENN, Circuit Judge.

The primary issue on this appeal pertains to a retrial of a defendant on certain counts deadlocked by a prior jury without resubmission of those counts to a grand jury. The question presented is novel and complex, although prosecution of criminal cases by indictment even precedes the adoption of the federal constitution. The genesis of the appeal is a motion by the prosecution, following a prior jury trial, to dismiss several counts of the indictment on which the jury had deadlocked and proceed to sentence on the counts on which it had convicted.

A grand jury in the United States District Court for the Middle District of Pennsylvania initially indicted the defendant, Merritt G. Stansfield, Jr., on eleven counts and a separate count of money laundering forfeiture. The first four of the eleven counts charged mail fraud. Count V charged using fire to commit mail fraud and one count of arson. Counts VI through X charged money laundering. Count XI charged tampering with a witness. The defendant pled not guilty. He was tried to a jury and convicted on certain counts but the jury deadlocked on the others.

The Government moved to dismiss the deadlocked counts "without prejudice to their refiling" in the event any court ordered a new trial on the counts resulting in conviction. Defendant's counsel concurred and the trial court granted the motion. On appeal, this court affirmed the defendant's convictions on all counts but reversed the defendant's conviction for witness tampering. See United States v. Stansfield, 101 F.3d 909 (3d Cir. 1996) (Stansfield I). On remand, the District Court directed the prosecutor to notify the court and defense "as to what counts, if any, he wishes to re-try." The Government gave notice that it intended to retry the defendant on both the remanded count and the deadlocked counts that had been dismissed. The defendant stood trial a second time and a jury convicted him on all counts.1 The defendant timely appealed. We will affirm the

_____

1. The District Court had subject matter jurisdiction pursuant to 18 U.S.C. S 3231 and this court has appellate jurisdiction pursuant to 28 U.S.C. S 1291.

2

conviction on all counts except the conviction for Count V (arson) which we reverse.

I.

The underlying facts of this case were previously recounted at considerable length by this court in Stansfield I, 101 F.3d at 910–912. We summarize those stated there as are pertinent to this appeal. In 1990 Stansfield's home was destroyed by fire. His insurer, Erie Insurance Company (Erie), agreed to reimburse Stansfield for the replacement cost of the insured destroyed items, as well as the cost from the loss of the use of his house. In May of 1992, Stansfield sent Erie a list of insured items he claimed were lost in the fire, some of which were later found intact at other locations. Erie and state law enforcement officials began an investigation of the fire and determined that arson caused it. Stansfield was never conclusively found to be the arsonist. Erie investigators and Pennsylvania State Police spoke with Dwight Hoffman, a friend of Stansfield's. Hoffman was quite knowledgeable about Stansfield's home and its contents; he had stored many of Stansfield's personal effects in his home prior to the fire.

State troopers also communicated with Jack Love, whom Stansfield had solicited to burn his home. Stansfield threatened to kill Love if he told anyone of the solicitation. Love informed Stansfield in May 1993 that law enforcement officials had contacted him about the fire. That September, Erie referred the matter to federal postal inspectors. The Postal Inspector presented the case to the United States Attorney's Office, which requested that the Postal Inspection Service continue the investigation.

On October 7, 1993, Stansfield entered Dwight Hoffman's home uninvited. Hoffman's parents, Eugene and Joyce, were present but Dwight Hoffman was not. When asked what he was doing there, Stansfield replied that he was "sick and tired of [Dwight] running down [Stansfield's] name and ruining [his] business." Stansfield struck the Hoffmans, knocking them to the floor. He repeatedly kicked Eugene Hoffman in the head and body. When Eugene Hoffman attempted to get up, Stansfield knocked him down

3

again, kicking him in the head until Hoffman became partially unconscious. Stansfield took both the Hoffmans to the basement. There he bound their hands and feet. When Eugene Hoffman tried to free himself, Stansfield kicked him in the head several more times.

Stansfield then went upstairs, returning shortly with a shotgun and shells. He loaded the gun and waited for Dwight Hoffman to arrive. When Dwight Hoffman appeared, Stansfield escorted him to the basement, hit him in the mouth with the butt of the shotgun, and ordered him to sit next to his parents. Stansfield then placed the shotgun on the throat of Dwight Hoffman and stated, "I'm going to ask you some questions, and I want the truth, because the gun is loaded, the safety is off, and my finger is on the trigger, is that clear?"

Stansfield first inquired why Dwight Hoffman had sent the cops after him about his house, or why Dwight had "called the police about his fire." At some point Dwight Hoffman lunged for the gun. It went off, firing a shot between Dwight Hoffman's neck and Joyce Hoffman's head. A struggle ensued. Eventually Dwight and Eugene Hoffman were able to subdue Stansfield until a police officer arrived.

The jury convicted the defendant on Counts I, II, III, VI, VII, and XI. The jury deadlocked as to Counts IV, V, VIII, IX, and X and a mistrial was declared as to these counts. As to Count XII, the defendant waived his right to a jury trial and the District Court returned a special verdict of forfeiture.

A few days after the jury returned its verdict, the District Court ordered the scheduling of jury selection and retrial on the deadlocked counts. The Court also directed the Government to file notice as to whether it intended to retry or otherwise dispose of those counts. Complying with the Court's directive, the Government filed a notice and motion seeking the dismissal of Counts IV, V, VIII, IX, and X, "without prejudice to their refiling in the event a new trial is ordered by this or any other Court on any count of conviction." After conferring with defendant, defense counsel filed an amended certificate of concurrence.[2]

_____

2. Rules 7.1 and 7.2 of the Rules of Court of the United States District Court for the Middle District of Pennsylvania required that pretrial and

4

Thereafter, the District Court ordered the dismissal of the counts "without prejudice to their re-filing in the event a new trial is ordered by this or any other court."

On appeal, this court affirmed the judgment of conviction as to Counts I, II, III, VI and VII, but reversed and remanded as to Count XI, the witness tampering count. See Stansfield, 101 F.2d 909. On remand, the District Court ordered counsel for the Government to file a notice, with a certificate of concurrence or nonconcurrence attached, as to what counts, if any, he wished to retry. The Government complied with the District Court's order, giving notice that it would retry the defendant on all outstanding counts (Counts IV, V, VII, IX, and XI). Defense counsel filed an "omnibus pretrial motion" that included, among other things, an objection to the Government's election to retry all pending counts on the grounds that the deadlocked counts had not been resubmitted to a grand jury, that reprosecution of Count V was barred by the statute of limitations, and that retrial of the other deadlocked counts was barred by the Speedy Trial Act.

The District Court denied the omnibus motion stating that it understood the dismissal merely to reflect that the deadlocked counts were set aside pending the resolution of the defendant's post trial motions, appeals or collateral challenges to the judgment of conviction and sentence, and that the Government always intended to retry the defendant on the deadlocked counts. Defense counsel also filed another motion seeking an order directing the Government to specify a procedure for the refiling of Counts IV, V, VIII, IX and X, and objecting to the defendant's retrial on the dismissed counts on the basis that the Court lacked jurisdiction. The Court denied the motion on the ground that the Government's notice of record of its intent to retry

_____

post-trial motions, with certain exceptions not applicable in this instance, "shall contain a certification by counsel from the movant that he or she has sought concurrence in the motion from each party, and that it has been either given or denied." Compliance with these rules is generally enforced strictly, and the Clerk of the District Court will normally not accept a motion, other than a permissible ex parte motion, without a certificate of concurrence or non-concurrence attached.

the defendant was sufficient for the reinstatement of the dismissed counts. The Court, at the same time, denied Stansfield's motion for an order directing the Government to specify a procedure for refiling of the previously dismissed counts. The defendant again was tried to a jury and convicted on all counts.

II.

On appeal, the defendant first contests the meaning of the term "re-filing" as used in the Government's motion to dismiss on the deadlocked counts. The motion stated in pertinent part:

> WHEREFORE, the government respectfully petitions the Court to enter an Order dismissing Counts IV, V, VIII, IX and X, without prejudice to their re-filing in the event a new trial is ordered by this or any other Court.

The Court's order of dismissal tracked the exact language used in the Government's motion. The defendant argues that, regardless of whether the procedure is termed "re-filing" or "reinstatement," the Government did nothing to revive the dismissed counts: "After removal, no motion for reinstatement was ever filed, nor were the counts re-submitted to the grand jury or re-filed in any way." At oral argument, counsel for the defendant vigorously asserted that "the Government did nothing to either resubmit to the grand jury or reinstate by motion to the court." He asserted that the Government cannot merely proceed to trial on the dismissed counts and that the defendant is entitled to have the conviction on such counts vacated. However, he recognized that the trial court can reinstate the dismissed counts for prosecution. We believe this is what the court proceeded to do.

Following this court's decision in Stansfield I vacating the defendant's conviction for witness tampering and remanding for a new trial, the District Court structured a procedural mechanism which effectively reinstated the deadlocked counts and duly placed them in position for prosecution. The trial judge ordered:

> 1. Counsel for the Government shall notify the court and opposing counsel as to what counts, if any,

6

he wishes to retry, with said notification to befiled with the court on or before March 10, 1997. A certificate of concurrence or nonconcurrence of defense counsel shall be attached to the notice.

2. If defendant does not concur in the proposed course of action, he shall file his response on or before March 17, 1997.

3. If the Government fails to notify the court of its intentions on or before March 10, 1997, it shall be deemed to have waived any right which may exist to retry any of the counts set forth in the indictment, and the court will proceed to schedule resentencing.

4. In the event of a retrial, jury selection will be held April 1, 1997, ... . Presentation of the case to the jury will not commence before April 15, 1997.

The Government complied with the District Court's order, notifying the defendant and the Court that it intended to retry the defendant on the remanded and deadlocked counts. Thus, the trial court did take affirmative action to reinstate prosecution and specifically provided in its order that if the defendant did not concur in the proposed course of action, "he shall file his response on or before March 17, 1997." The defendant did not interpose any objection or make any response. He did not challenge the procedure that the District Court had set in place for reinstatement of the indictments and retrial. He raised no objection to the Court's explicit order that jury selection would be held on April 1, 1997. The defendant and his trial counsel were well aware that he was to be retried on the deadlocked counts in the original indictment.

The Government strenuously argues that the deadlocked counts were properly reinstated following the remand of Count XI for trial. The only purpose in dismissing the counts subject to the reservation was to permit sentencing and the entry of a final appealable judgment on the convicted counts. In the event the Court of Appeals affirmed on those counts, there would be no retrial: if not, the Government reserved the right to reinstate and retry on the deadlocked counts. The Government notes that this was the understanding of the District Court and the Court

7

of Appeals, that the latter characterized the arrangement as a dismissal of the deadlocked counts "subject to reinstatement should any portion of the conviction be vacated." Stansfield I, 101 F.3d at 913. The Government observes that neither on the first appeal nor in the opinion of this court disposing of it, did anyone characterize the agreement as a dismissal subject to re-indictment.

The defense, on the other hand, argues just as strenuously that the deadlocked indictments were dismissed absolutely. We do not so view the court's order or the Government's motion to dismiss. The motion for dismissal specifically requested that the counts dismissed be "without prejudice to their re-filing in the event a new trial is ordered by this or any other court." The prosecution is allowed considerable discretion in managing its cases and docket and it reserved the right to retry the deadlocked counts in the event a new trial was granted. The defendant concurred, made no objection, or any response in opposition. The Government's reservation of the right to retry was not predicated upon re-indictment. The court's order approved and incorporated the reservation. Although the term "re-filing" in the Government's motion may have been imprecise, especially in the context of the circumstances when made, the motion, nonetheless, shows that its purpose was to provide the Government with a deferred option to retry the dismissed indictments in the event the defendant succeeded in obtaining a new trial on any of the counts on which he was convicted. Nothing in the motion suggests that the counts were to be resubmitted to a grand jury before another trial.

The trial judge explained what occurred and what he meant by the order of dismissal.

> It was the court's understanding that this agreement simply meant that no-retrial of the remaining counts would occur absent a re-trial, for whatever reason, of the counts as to which there was a verdict. Whether termed "refiling," "reactivation," or"reinstatement," this court was under the impression that the effect of the dismissal was that these counts were simply set aside pending resolution of Stansfield's post-trial motions, appeals or collateral challenges to the judgment of

8

> conviction and sentence; should any of these challenges be resolved in Stansfield's favor, the counts as to which there was a mistrial would be pursued in a second trial. The Government's brief reflects this view, of course, and we believe the language of the motion, order and amended certificate of concurrence all support this interpretation.

(7/23/97 Order at 4-6) Thus, the District Court believed, as did the Government, that the deadlocked counts retained sufficient vitality to permit their trial, either immediately or in the future, without resubmission to a grand jury if a retrial were ordered. When first indicted, they had been returned by a grand jury in open court, filed and docketed in the clerk's office, and the filings noted on the face of the indictment; a resubmission could achieve nothing more.

Accordingly, we conclude that when the Government gave notice to the defendant and the Court that it intended, inter alia, to retry the deadlocked counts, that notice served as the functional equivalent of reinstating the qualifiedly dismissed counts. The defendant points to no prejudice by this procedure. He had notice from the prosecution of the specific charges on which he was to be retried; they had been found by a grand jury, they had never been dismissed absolutely, and he still could plead the judgment in bar of further prosecution for the same offense.

The defendant asserts that he believed by concurring with the Government's request to refile without prejudice that he was not waiving any rights he may have had to resubmission of the indictment to a grand jury. However, the defendant had no right at the time he concurred to have the deadlocked indictments resubmitted to a grand jury; the Government could have proceeded to trial on those counts promptly without submitting them to another grand jury. We fail to see how that deferment required a resubmission to a grand jury. An indictment is an accusation only, and its purpose is to identify the defendant's alleged offense, United States v. Glaziou, 402 F.2d 8, 15 (2d Cir. 1968), and fully inform the accused "of the nature of the charges so as to enable him to prepare any defense he might have." Zuziak v. United States, 119 F.2d 140, 141 (9th Cir. 1941); Mitchell v. United States, 143

9

F.2d 953 (10th Cir. 1944). It also enables him to plead the judgment, if any, in bar of further prosecutions for the same offense. United States v. Behrman, 258 U.S. 280, 288 (1922); Mitchell, 143 F.2d at 953.

The court's order permitting a retrial without resubmission of the deadlocked indictments to a grand jury in no way prejudiced the defendant. First, it opened up the possibility that he might never be retried by the Government and definitely avoided the reality of being retried immediately, a right that the Government clearly possessed. Second, the rights the defendant enjoyed once the grand jury returned an indictment against him were limited primarily to a speedy trial and the right to be fully informed of the nature of the charges so as to prepare his defense and the right to plead his conviction, if any, on those counts to bar further prosecutions. These rights were fully preserved and were in no way affected by the concurrence or the Government's dismissal of the deadlocked counts. The defendant attempts to structure his claim on the inept use of the word "refiling." In the context it was used it could only have meant reinstatement of the indictment on the court docket. The Government accomplished the reinstatement when it gave notice to the Court, and a copy to the defendant, that it would retry the defendant on Counts IV, V, VIII, IX and X, the deadlocked counts, and Count XI, remanded by the Court of Appeals.

The United States Supreme Court long ago attempted to avoid reversal of a criminal conviction on the basis of mere technicalities. See Kotteakos v. United States , 328 U.S. 750 (1946). In Kotteakos, the Court observed that the effort to revise the Federal Rules of Criminal Procedure had, as its ultimate goal, " `not [to] be technical, where technicality does not really hurt the party whose rights in the trial and in its outcome the technicality affects.... [Rather,] the party seeking a new trial [has] the burden of showing that any technical errors that he may complain of have affected his substantial rights, otherwise they are to be disregarded.' " 328 U.S. at 760 (quoting H.R. Rep. No. 913, 65th Cong., 3d Sess., 1.). The defendant has failed to show that his substantial rights have been adversely affected. To the contrary, as evidenced by defense counsel's amended

concurrence, he was well aware that he would be retried on the deadlocked counts. His rights afforded under the Fifth Amendment were in no way impaired for he is not required to answer for a crime "unless on presentment or indictment of a grand jury." He was indicted, and now he has had a second trial on that indictment after adequate notice and time to prepare. We conclude that Counts IV, V, VIII, IX, and X were appropriately reinstated by the Government following this court's remand for trial of Count XI.

III.

The defendant also contends that the statute of limitations barred the Government from retrying him on Count V because more than five years had elapsed when the Government elected to retry him.

The general federal statute of limitations applies in this instance. It provides that, except as otherwise expressly provided by law, no person shall be prosecuted for any non-capital offense unless the indictment is found within five years next after such offense has been committed. 18 U.S.C. S 3282. Even though the defendant was well aware that the Government intended to retry him on the deadlocked counts, "the statute of limitations incorporates an `irrebuttable presumption' that, beyond the period of limitation, `a defendant's right to a fair trial would be prejudiced.' " United States v. Midgley , 142 F.3d 174, 177 (3d Cir. 1998)(quoting in part United States v. Marion, 404 U.S. 307, 322 (1971)). Here, unquestionably, the Government failed to satisfy the five year period.3

_____

3. The charged offense occurred on December 12, 1990. He was indicted on June 14, 1994, three years and one hundred and seventy-five days later. As of June 13, 1995, the statute of limitations began to run again when the indictment was dismissed. The government did not give notice that it intended to retry Count V until March 6, 1997, one year and two hundred and sixty-three days after the dismissal. The one year and two hundred and sixty-three day period plus the three years and one hundred and seventy-five day period combined totals five years and seventy-three days. Hence, it is unquestionable that the five year statute of limitation period was breached.

11

The Government argues that the June 13, 1995 dismissal "was part of a bargained-for exchange, from which both sides expected to benefit." The Government claims that it would not have moved for the dismissal of Count V without the defendant's agreement that he could be retried in the event of a retrial. The fundament of the Government's position is that the defendant "unequivocally agreed" that he could be retried on all the dismissed counts if this court remanded any or all of the counts of conviction for retrial; that the defendant and Government entered into a "bargained for exchange."

There was no agreement, however, between the parties. The defendant never agreed that the Government could retry him on all counts. In particular, the defendant never agreed to waive the statute of limitations as to the arson charges, notwithstanding the Government's bold assertion that "[D]efendant's unqualified agreement to retrial ... amounted to a de facto waiver of the statute of limitations." The Government's reliance on the defendant's concurrence in the motion to dismiss the deadlocked counts as an "unjustified agreement for retrial" is misplaced. The concurrence did not rise to the level of an unequivocal agreement; it merely complied with a local court rule.4 The Rule carries no comment or history explaining its purpose. As we analyze it, however, the Rule is a procedural mechanism to expedite the business of the court. Compliance with it provides notice to the non-movant party of the proposed motion with an opportunity to acquiesce, by concurrence, object, except or otherwise respond. 5 The Government cites U.S. v. Salimo, 81 F.3d 1453, 1460-62 (9th Cir. 1996), cert. denied, ___ U.S. ___; 117 S. Ct. 436 (1996), for the proposition that there is no principled basis for treating this dismissal of the deadlocked counts

_____

4. For the applicable court rule, see note 2, supra.

5. Appended to the government's June 5, 1997 Notice and Motion for Dismissal of Counts was the defendant's certificate of concurrence, wherein the defendant stated that he "concur[s] in the government's request to dismiss Counts IV, V, VIII, IX, and X without prejudice to their right to refile these counts in the event that a new trial is ordered
by Your Honorable Court or by any other Court on Counts I, II, III, VI, VII, or XI." (SA11)

differently than the dismissal of counts subject to reinstatement as part of a plea agreement. The Government also relies on Ricketts v. Adamson, 483 U.S. 1, (1987), where the defendant, charged with first degree murder, was permitted to plead guilty to a lesser charge after trial commenced, pursuant to a plea agreement. The plea agreement provided for automatic reinstatement of the original charge if he breached the agreement. The defendant subsequently breached the plea agreement, and the first degree murder charge was reinstated; after a trial, the court sentenced the defendant to death. The Supreme Court held that reinstatement of the first degree murder charge was not improper.

We do not believe that Salimo or Adamson are applicable. They both involve plea agreements, the breach of which nullified the plea agreement and permitted automatic reinstatement of the dismissed counts. As the Supreme Court reasoned in Ricketts, "[t]he terms of the agreement could not be clearer; in the event of respondent's breach occasioned by a refusal to testify, the parties would be returned to the status quo ante, in which case respondent would have no double jeopardy defense to waive." Id. at 9–10. Here, the Government reasserts in its supplemental letter brief to us that "both parties bargained for and received substantial benefit under the agreed-upon dismissal of the mistried counts in the instant case." As we have stated, the concurrence under the Local Rule of Court never amounted to an agreement, particularly a bargained-for agreement giving the defendant "substantial rights." As we see it, it gave the defendant nothing more than a possibility that the delay might lead to no subsequent trial, a possibility which never eventuated.

In no way can we see how the concurrence can be construed to rise to the level of an agreement or a bargained-for exchange. There is nothing of record to even suggest that the defendant ever bargained for the dismissal of the deadlocked counts, that the defendant reneged on any bargain it made with the Government, or that defendant explicitly or implicitly waived the statute of limitations as to the arson charge. The Government relies on Midgley, 142 F.3d at 178, for its argument that the

13

statute of limitations was tolled; the case is inapposite.6 The defendant at no time misled the Government or prevented it from asserting its rights.

The Government also argues that none of the policy concerns underlying the statute of limitations exist here. It asserts that the defendant was not exposed to an indefinite suspension of prosecution that impaired his constitutional rights or prolonged his anxiety and concern over the pending charges. It argues that "the procedure agreed to was not an indefinite suspension of prosecution but a finite one `limited by the time it took this court to dispose of defendant's first appeal.' " Moreover, it contends that equitable tolling of the statute of limitations should apply because the defendant purportedly agreed that he could be retried on all of the dismissed counts. For reasons stated above, we do not agree. Thus, until the deadlocked indictments were reinstated, the statute continued to run.

Accordingly, the defendant's conviction on Count V, arson, will be reversed.

IV.

The defendant also contends that the presence of the arson charge (Count V) kept him from testifying with respect to his defense on witness tampering (Count XI). He asserts: "Count XI is the fulcrum count in this indictment."

The defendant's argument lacks substance because it is clear that "[t]here is the high probability" that the arson and fraud evidence would have been admitted because the Government "was entitled to some latitude in proving its witness tampering count to demonstrate its theory that Stansfield had acted out of the concern of exposure for the arson and fraud." The defendant points to no evidence to

_____

6. In Midgley, this court stated that criminal statutes of limitations may be subject to tolling, suspension, and waiver where (1) the defendant has actively misled the plaintiff, (2) if the plaintiff has `in some extraordinary
way' been prevented from asserting his rights, or (3) if the plaintiff has timely asserted his rights mistakenly in the wrong forum. Id. at 179 (quoting Kocian v. Getty Refining & Marketing Co., 707 F.2d 748, 753 (3d Cir. 1983)).

suggest that, having been convicted of three counts of mail fraud based on the arson, he would have abandoned his right to testify in defense of the "fulcrum count" on witness tampering out of fear of incriminating himself on the related charge of arson. As the Government observes, the defendant has not even proffered that if he succeeds in obtaining a remand he will testify under oath that he would have testified in defense of Count XI but for the fear of being convicted on the arson count. Moreover, we agree with the Government's observation that "[i]t defies common sense to suggest that defendant would have been dissuaded from testifying in his own defense on the `fulcrum' count by a fear of self-incrimination on the duplicative count of arson, which had no effect on defendant's Sentencing Guideline calculation." Nonetheless, he seeks shelter in our decision in United States v. Pelullo, 105 F.3d 117, 124–126 (3d Cir. 1997).

His understanding of this court's decision in Pelullo, however, is misplaced. In Pelullo, the burden was on the Government to prove that prior testimony compelled by a Brady violation was not the "fruit of the poisonous tree." In this case, the Government was not guilty of any violation in presenting its case, especially a constitutional violation. In essence, the defendant's complaint is that he should have had a severance of the arson count. To obtain a severance, the defendant must make a convincing showing that he has important testimony to give on one count and a strong reason to refrain from testifying on another. United States v. Reicherter, 647 F.2d 397, 400–41 (3d Cir. 1981). The defendant here made no effort to make such showing. He never moved to sever the arson count from trial on the other counts. This suggests that at trial the defendant had no concern about incriminating himself in the arson count by testifying in his defense on the witness tampering count. At his second trial, acquittal on the "fulcrum count" of witness tampering was paramount for him because of the effect of its conviction on the Sentencing Guideline calculation.

Accordingly, we see no merit to the defendant's request for remand to the District Court for a hearing to determine whether he would have testified at the earlier trial in the absence of the arson charge. The request will be denied.

15

V.

Finally, we turn to the defendant's argument that the District Court's jury instructions completely stripped the witness tampering statute of the required federal mens rea element.7 He contends that this court's decision in Stansfield I and the subsequent decision in United States v. Bell, 113 F.3d 1345 (1997), created uncertainty as to the Government's burden under Section 1512. The defendant asserts that he is entitled to a new trial because"there is utterly no evidence in this record that [he] knew of any pending investigation or had the slightest intimation that it was either a federal offense that was under investigation or that federal law enforcement officers would ever be involved in the investigation at a subsequent time."

To convict under Section 1512(a)(1)(C), this court held in Stansfield I:

> [T]he Government must prove: (1) the defendant killed or attempted to kill a person; (2) the defendant was motivated by a desire to prevent the communication between any person and law enforcement authorities concerning the commission or possible commission of an offense; (3) the offense was actually a federal offense; and (4) the defendant believed that the person

_____

7. Witness tampering is codified under 18 U.S.C. S 1512. That section provides in pertinent part:

> (C) Whoever intentionally harasses another person and thereby hinders, ... prevents or dissuades any person from--
>
> (1) attending or testifying in an official proceeding;
>
> (2) reporting to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense ...;
>
> (3) arresting or seeking the arrest of another person in connection with a Federal offense;
>
> (4) causing a criminal prosecution ...
>
> or attempts to do so, shall be fined under this title or imprisoned not more than one year, or both.

18 U.S.C. S 1512(a)(1)(C).

in (2) above might communicate with the federal authorities. The last element may be inferred by the jury from the fact that the offenses were federal in nature, plus appropriate evidence.

101 F.3d at 918 (emphasis in original). We directed the District Court on remand to instruct the jury that before it could find Stansfield guilty of violating Section 1512(a)(1)(c) it must also find, in addition to the other elements of the offense, "both that he was motivated by a belief that the victim might communicate with federal authorities concerning the commission or possible commission of an offense, and that the offense in question is in fact a federal offense. Given appropriate evidence, if the juryfinds the latter fact to exist, it may find the former to exist as well." 101 F.3d at 922.

Shortly thereafter, in Bell, we observed that, under the statutes's clear command, the Government need not prove any "state of mind" on the part of the defendant with respect to the federal character of the proceeding or officer, 18 U.S.C. S 1512(f). Therefore, we did not read the fourth element as requiring proof that "the defendant believed the victim might communicate with law enforcement officers whom the defendant knew or believed to be federal officers. Rather, we read this sentence as recognizing that what the statute mandates is proof that the officers with whom the defendant believed the victim might communicate would in fact be federal officers." 113 F.3d at 1349 (emphasis in original; footnote omitted).

We, therefore, concluded:

[T]he law of this circuit after Stansfield is that the Government must prove that at least one of the law-enforcement-officer communications which the Defendant sought to prevent would have been with a federal officer, but that the Government is not obligated to prove that the Defendant knew or intended anything with respect to this federal involvement.

Id. (emphasis added).

The District Court in this trial carefully followed this court's direction and instructed the jury that the

17

Government is required to prove each of the following elements beyond a reasonable doubt before it couldfind the Defendant guilty of tampering with a witness.

> One, that the Defendant attempted to kill a person. Two, that the Defendant was motivated by a desire to prevent the communication between a witness and law enforcement authorities concerning the commission or possible commission of an offense. Three, that the offense was actually a federal offense. And four, that the Defendant believed that the witness might communicate with the federal authorities.

(emphasis added). The Court then elaborated on each of the four elements, including a statement that the Government need not prove that the defendant believed Dwight E. Hoffman might communicate with some particular federal officer or with an agent involved in a particular federal investigation or that the defendant knew or believed that the law enforcement officers were federal.[8]

_____

8. The elaboration included the following:

> The second and third elements relate to the nature of the offense or offenses which are the subject of potential communication to law enforcement authorities. The offenses must be federal offenses. That is the Government must prove beyond a reasonable doubt that Dwight E. Hoffman might have communicated to law enforcement authorities information concerning a federal offense and that the Defendant was motivated by a desire to prevent that communication. The Government need not prove that such motive was the sole motive for Defendant's actions, but the Government must prove that it was a substantial motivating factor ... .

> In fact, there need not be an ongoing federal investigation or even any intent on the part of federal authorities to investigate. Nor must the Government prove that the Defendant knew or believed that the offense was a federal offense. Although, you may consider the fact that the offense is a federal offense in determining whether there might be communication with federal authorities.

> The purpose of the killing must be to prevent communication with a law enforcement officer when the communication relates to an offense which is a federal offense, and the law enforcement officer with whom Dwight E. Hoffman might communicate is actually a federal law enforcement officer.

(A1352–53)

In this instance, the District Court's instructions were consistent with our statement of the law in Stansfield I and Bell. Moreover, it is evident that the defendant is under the misperception that in order to convict the Government must specifically establish his state of mind.9 As we stated in Stansfield I and later clarified in Bell, the fourth element may be "inferred from the fact that the offense was federal in nature, plus additional appropriate evidence." It is undisputed that the offenses were federal in nature, and as we mention below, there was additional appropriate evidence.

Accordingly, we conclude that the District Court's instructions were consistent with Stansfield I and Bell.

This, however, does not dispose of the remainder of defendant's argument, because he further claims that the evidence presented lacks the "additional appropriate evidence." He asserts that there is no evidence that he knew of any pending investigation or that federal officers would ever be involved. The latter element has no relevancy to the statute or charge and warrants no discussion. In its argument before this court in the instant case, the Government represents that the evidence in this trial closely paralleled the evidence presented in Stansfield I. There, we concluded the underlying offenses clearly were federal offenses and that evidence sufficiently supported a conviction under 18 U.S.C. S 1512(a)(1)(C). We stated:

> The evidence reflected that Hoffman had already cooperated several times with state authorities and with Erie. Stansfield had knowledge of Hoffman's past cooperation and was aware that some investigation, though not necessarily a federal one, was underway.

_____

9. 18 U.S.C. S 1512(f) provides:

"In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstances

    1) that the official proceeding before a judge[or court] ... is before
    a judge or court of the United States ... or

    2) that ... law enforcement officer is an officer or employee of the
    Federal Government or a person authorized to act on behalf of
    the Federal Government ... ."

19

> Moreover, though it is unclear whether Stansfield was
> aware of it, the evidence also showed that federal
> authorities had begun an investigation approximately
> one month prior to the conduct in question. Given that
> Stansfield violated several federal laws and based on
> the actions he took thereafter, a jury could reasonably
> find beyond a reasonable doubt that the attack was
> motivated, at least in part, by Stansfield's belief that
> Hoffman might cooperate with federal authorities.

Stansfield I, 101 F.3d at 919.

We have carefully reviewed the record in this trial and we are satisfied that it supports our previous conclusion that the underlying offenses were federal and that the evidence adequately supported a conviction under the witness tampering statute.

Erie commenced an investigation into the cause of burning of the defendant's home shortly after the fire in December 1990, although Erie did make payments over a period of time on account of the policy. Richard McGee, a senior investigator for Erie and a former federal postal inspector, met with the defendant shortly after the fire and took a statement from him. In May 1991 he examined Stansfield under oath in the office of defendant's attorney, Leslie Fields, but thereafter the investigation lay dormant for much of the next eighteen months. It intensified, however, when McGee received an anonymous phone call in November 1992 that the damage to defendant's home was caused by fire and that the defendant was the arsonist. McGee communicated this information to the Pennsylvania State Police, with whom he kept in contact through his investigation, and the police officers separately conducted interviews and an investigation.

McGee called on Dwight Hoffman's place of business, where he identified himself to the employees, and where Dee Hoffman was also employed. He interrogated Dwight Hoffman separately and at a secret rendezvous because of Hoffman's great fear of physical violence should the defendant learn of his cooperation with the investigation. On April 18, 1993, State Trooper Woodcock appeared at the Hoffmans' place of business and left a message for Dwight

Hoffman to call him. On September 10, 1993, shortly before defendant's assault of the Hoffmans, McGee referred all of his files and notes of the investigation to his former colleague, John Holland, United States Postal Inspector, for federal investigation in light of the evidence McGee had uncovered of potential federal violations of law, including mail fraud. Several weeks later, the defendant entered Dwight Hoffman's home and assaulted him and his parents. Stansfield's first inquiry of Dwight revealed his knowledge of and concern for the criminal investigation for he asked: "Why did you send the cops after me about the fire at my house?" By this time, Stansfield had unlawfully received the seven checks aggregating $377,544, the subjects of the federal mail fraud counts. We believe this evidence provided the jury with a sufficient basis on which to infer that the defendant knew when he viciously assaulted the Hoffmans that he was under criminal investigation, that the offenses were federal, and that they or one of them had communicated or might communicate with the federal authorities.

VI.

Accordingly, we will affirm the judgment of conviction on all counts except the arson count. As to Count V, the conviction and sentence is reversed and the judgment of sentencing on all counts will be vacated and the case remanded to the District Court for appropriate resentencing.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit