**UNITED STATES of America,
Appellant,**

v.

**Edwin P. AGUIRRE,
Defendant–Appellee.**

**No. 1485, Docket 90–1133.**

United States Court of Appeals,
Second Circuit.

Argued June 14, 1990.

Decided Aug. 27, 1990.

Susan Corkery, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., Matthew E. Fishbein, Peter R. Ginsberg, Asst. U.S. Attys., of counsel), for appellant.

William Mogulescu, New York City, for defendant-appellee.

Ross & Hardies, New York City (Peter I. Livingston, Michelle J. D'Arcambal, New York City, of counsel), for amicus curiae The Legal Aid Society.

Chester L. Mirsky, New York University School of Law, New York City, amicus curiae.

Before LUMBARD, MESKILL and PRATT, Circuit Judges.

LUMBARD, Circuit Judge:

The United States appeals the grant of a writ of error *coram nobis* to Edwin Aguirre by the District Court for the Eastern District of New York (Charles P. Sifton, *Judge*). After a hearing on January

12, 1990, the court held that Aguirre received "ineffective assistance of counsel" during his 1989 trial for cocaine importation and possession. The court vacated the conviction and granted a new trial.

Our study of the trial record, the papers submitted thereafter, and the hearing on the *coram nobis* petition, persuades us that the court's findings of fact and conclusions of law are clearly erroneous. The record does not show that Aguirre's representation "fell below an objective standard of reasonableness," *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), or "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," *id.* at 686, 104 S.Ct. at 2064. Nor do we find any support for the view that the outcome of the trial would have been different had counsel followed the course Aguirre suggests.

Accordingly, we reverse and remand for sentencing.

## I.

After Ecuatoriana de Aviacon flight 052 arrived at Kennedy Airport from Quito, Ecuador on the evening of August 5, 1988, customs officials, contrary to their usual practice, inspected the luggage of the crew. One official, inspecting the luggage of Aguirre, a flight attendant, noticed that the sides of his blue Samsonite bag were "thick and heavy." Examination of the contents of the suitcase revealed false sides in which were found packages containing fourteen pounds of cocaine.

The grand jury filed an indictment on August 19, 1988 charging Aguirre in Count One with "knowingly and intentionally" importing cocaine into the United States, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 960(b)(1)(B)(ii), and in Count Two with "knowingly and intentionally" possessing with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii)(II).

The trial took place over two days beginning on April 3, 1989, and after two days of deliberations, resulted in a verdict of guilty on both counts. Aguirre was represented by James C. Neville and Peter Kirchheimer of the Legal Aid Society's Federal Defender Services Unit. Neville, who acted as principal counsel from the time of Aguirre's arrest, was admitted to practice in September 1985. During almost two years with Legal Aid, he had represented clients in fifteen trials. Kirchheimer has been an attorney since 1974.

### A. *Investigation Before Trial*

During initial preparations, Neville relied heavily on his conversations with Edwin Aguirre, his brother Oscar, who resided in New York City, and Edwin's wife Jennie, who came to New York to assist in his defense. Fluent in Spanish, Neville regularly conversed with them in that language. Despite their assistance and cooperation, Neville encountered great difficulty in arranging for interviews of potential witnesses, all of whom resided in Ecuador.

*1. The Source of the Suitcase* Based on his conversations with Aguirre and his family members, Neville's early strategy was to establish that Aguirre brought the suitcase into the United States not knowing it contained cocaine. To accomplish this, Neville hoped to prove that the blue Samsonite, which Aguirre said he had borrowed from an airline storeroom because of the theft of his regular suitcase, contained the cocaine before Aguirre obtained it. Neville planned to trace the suitcase to Julia Orovic, a Dutch national who abandoned it in Caracas, Venezuela after an Ecuatoriana flight from Quito. Thereafter it had been returned to Quito, the point of origin.

Despite a subpoena, Ecuatoriana failed to make available the witnesses necessary to pursue the Orovic aspect of the defense. It complied in part only after the court issued an order to show cause why it should not be held in contempt. Because Ecuatoriana resisted producing these potential witnesses, Neville was unable to interview them until the evening of the first day of trial. In the course of these interviews, Neville learned that it was doubtful that the Orovic theory could be

supported. Moreover, some of the witnesses revealed damaging information.

First, Germanico Coronel, an airline employee, informed Neville that the Orovic suitcase, which he had previously described in a telex on its arrival in Quito, did not contain wheels, straps or handles. By this description, the suitcase differed from the blue Samsonite, which did have those features. Second, Carmen Trueba Piedrahita, an employee who was prepared to testify that the seized and the Orovic suitcases were the same, weakened significantly Aguirre's account of the events leading up to his boarding flight 052. Aguirre had earlier told Neville that he received a last-minute call from the airline to work the flight and that, as a result, he arrived at the airport late and boarded hurriedly. Piedrahita, who impressed Neville as a bright, credible witness, volunteered that Aguirre arrived quite early and refused her request to allow his suitcase to be identified and inspected for drugs by trained dogs.

Third, Neville hoped that Luis Peredes, the employee who removed the blue Samsonite from the storeroom and gave it to another employee to give to Aguirre, would corroborate the chain of custody of the Orovic suitcase by identifying its luggage tags. Instead, Peredes impressed Neville as a hostile witness whose testimony, if it was to be used at all, should be sharply curtailed to avoid a potentially damaging revelation. Peredes's failure to bring the original tags with him to New York, despite repeated requests that he do so, supported that impression and weakened his usefulness as a witness. Peredes also maintained that the Orovic suitcase was not decorated with stickers, in contrast to the seized suitcase, which was. Peredes was a dangerous witness for another reason; he had told Neville during their interview that narcotics sensitive dogs had come through the storeroom while the Samsonite was still there and that the results of the search were negative. This would have supported the government's position that cocaine was placed in the Samsonite after it was taken from the storeroom. At the post-trial hearing, Neville explained that he feared Peredes would "say something that [would] kill us." He added: "[M]y feeling was he was hostile because he thought Edwin Aguirre was guilty."

Additionally, Neville learned from Magdalena Solorzano, another airline employee, that in June 1988 Aguirre borrowed a suitcase from the storeroom but was told to return it. However, Solorzano had no knowledge concerning the blue Samsonite, which Aguirre borrowed in July 1988. Moreover, Neville learned from a potential witness that men's clothing had been removed from the Samsonite before it was lent to Aguirre, thus weakening the claim that the suitcase belonged originally to Orovic, a woman.

As a result of these interviews, Neville and Kirchheimer decided to abandon the Orovic theory. Instead, they chose to argue generally that Aguirre carried the cocaine unwittingly in a borrowed suitcase but not that he carried Julia Orovic's suitcase in particular. This change in strategy altered the tenor of the defense, and necessitated a number of subsidiary tactical decisions: they would not call Coronel and Piedrahita; the examination of Peredes would be limited; they would not argue, based on chemical evidence, that the brittle "slab" condition of the seized cocaine was caused by humidity from the airline's storeroom; they would forego arguing that the blue Samsonite, including the cocaine and other contents of the bag, weighed about forty-four pounds, approximately the same as the Orovic suitcase, according to airline records; and they would not seek to introduce documentary evidence, such as luggage tags and the airline storeroom entry book, which may have been relevant to proving Orovic's ownership of the blue Samsonite.

Sometime after the indictment, apparently as a result of Aguirre's claims of innocence, Neville arranged for Aguirre to take a lie detector test administered by the United States Attorney's office. By agreement, Neville was not present during the questioning, but he recalled that the Government agent, who briefed him beforehand, administered "an extremely elabo-

rate extensive interview." Aguirre failed the test; Neville was "dishearten[ed]" by the results.

*2. The Advice that Aguirre not Testify* Neville initially planned that Aguirre would testify on his own behalf. He believed, based on his conversations with Aguirre and his family, that Aguirre would make a credible witness and that the Government had little if any information with which to impeach him. He changed his mind because of his discovery, the night before trial, that the passport Aguirre carried stated inaccurately that he was unmarried and a student. Additionally, Aguirre's brother informed Neville that Aguirre had a second passport that Jennie, Aguirre's wife, brought to the United States after Aguirre's arrest. Neville was concerned that these revelations, were the jury to learn of them, would severely damage Aguirre's credibility because, as a professional traveller who often worked international flights, he should have carried a fully accurate passport.

Accordingly, Neville advised Aguirre immediately before trial that he should not take the stand. According to his statements during the post-trial proceedings, Neville informed Aguirre that although "[i]t was up to him to decide whether or not he would take the witness stand," Neville "firmly believed that he shouldn't and ... made that clear to him in no uncertain terms." Aguirre "sat passively and assented to my advice, as he had during the [previous] sessions where I informed him of my sense that he should take the witness stand."

### B. *The Trial*

*1. The Government's Case* The Government presented three witnesses. Customs Inspector Anthony Frangione testified searches of incoming flight crews are "a rarity" at Kennedy Airport. On this flight, Aguirre was the last airline employee to be searched. He carried three pieces of luggage: a small flight bag, a garment bag, and the Samsonite suitcase. The small bag was nearly empty. The Samsonite, which also contained only a few articles of clothing that could have fit within the small bag, was unusually heavy with thick sides. After further inspection, Frangione detained Aguirre and led him to a secondary search area, where DEA officers discovered twenty bags of cocaine, weighing fourteen pounds, in flattened "slab" form concealed in the sides of the suitcase.

DEA agent Larry Burstein testified that he interviewed Aguirre after inspecting the luggage. Aguirre denied that he planned to deliver the suitcase to anyone; he further stated that he borrowed the suitcase from Renzo Montesdeoca, an Ecuatoriana employee, because his own suitcase had been stolen from his Quito apartment. Aguirre said he had noticed the bag's unusual weight when he first borrowed it, but when he asked Montesdeoca about it, Montesdeoca told him the bag was reinforced to prevent damage during flight. As for the small amount of clothing in relation to the luggage he carried, Aguirre explained that he planned to purchase many items for his wife and daughter while in New York.

Florence Wong, a forensic chemist, testified that the seized cocaine might have been formed into hardened "slabs" by dissolving it in water or another solvent and pressing it. She acknowledged on cross-examination that humidity also causes cocaine to harden.

After the Government rested, Neville moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29, arguing that the Government had not established that Aguirre acted with the requisite knowledge. Denying the motion, Judge Sifton admonished Neville to consider not presenting any evidence.

> THE COURT: Are you ready to argue this to the jury in summation or are you going to present evidence?
>
> MR. NEVILLE: I'm going to present evidence if this motion is denied.
>
> THE COURT: I'll give you a minute to think whether that is a wise choice.
>
> I'll deny the motion for a judgment of acquittal but I think you ought to consider whether you can add anything to this case by presenting evidence or on whose side it's going to end up adding to.

*2. The Defense Case* Neville called three witnesses. Aguirre's wife Jennie testified that burglars stole several items from their apartment in April 1988, including Aguirre's regular suitcase, which had been issued by the airline. Aguirre used a borrowed suitcase for two flights, but later had to return it. On July 27, Montesdeoca arrived at the apartment while Jennie was upstairs. After he left, Aguirre went upstairs with the blue Samsonite. The next day, Aguirre remarked to his wife on its unusual weight. She lifted it, and Aguirre told her that Montesdeoca had "prepared" the suitcase so it would not "get hurt." Jennie then packed the suitcase and two other bags for Aguirre's flight to Los Angeles later that day.

After Aguirre's return from Los Angeles and a subsequent short flight to Peru, the airline called him to substitute for a coworker on the August 5 flight to New York. Mrs. Aguirre again packed Aguirre's bags, leaving room in the blue Samsonite for the items Aguirre would purchase in New York. She made a list of these items. The next day, Ecuadoran police entered the apartment and informed Mrs. Aguirre of her husband's arrest. Their search of the apartment revealed nothing.

Magdalena Solorzano testified that she learned in June 1988 that a suitcase from the airline lost-and-found had been given to Aguirre. On cross-examination, she did not recognize the Samsonite suitcase.

Aguirre's third witness was Luis Peredes. He testified that Montesdeoca instructed him to remove a suitcase from the storeroom to be given to a passenger. After retrieving the suitcase, Peredes removed its contents and placed them in another suitcase. Although he testified that the suitcase seized from Aguirre was the same one he retrieved from the storeroom and emptied, he did state that the suitcase, when he first viewed it, was not decorated with the stickers that were on the bag when he viewed it in court. Peredes also stated that he noticed nothing unusual about the suitcase he retrieved from the storeroom other than that it was "pretty heavy."

Ecuatoriana failed to produce for trial two additional prospective witnesses, employees Pablo Diaz and Diego Mantilla. Aguirre's brief asserts that they would have corroborated Aguirre's contention that he thought the excessive weight of the blue Samsonite was unusual, and that Mantilla would have explained that Aguirre was the last crew member to be searched at Kennedy because he had difficulty finding his luggage. However, there is nothing in the record to support these assertions. Neville declined to seek a continuance to allow for Diaz's and Mantilla's transport to New York. He explained that he believed their testimony "would have been weak, contrived-sounding, unhelpful and cumulative."

The record does not indicate whether either party sought to interview Montesdeoca, who delivered the blue Samsonite to Aguirre's apartment. According to DEA Agent Burstein, he asked Aguirre to identify Montesdeoca because the Samsonite had his name on it. Aguirre provided Burstein with the phone number of Montesdeoca's department at the Quito airport but did not know his home address and phone number. Aguirre does not claim that his attorneys should have tried to call Montesdeoca as a witness.

### C. *The Verdict and Post–Trial Proceedings*

The jury convicted Aguirre on both counts. Before sentencing, the court granted Aguirre's request on May 2 to discharge Neville and appointed Thomas White as new counsel. Less than two months later, Aguirre requested that White be discharged. On July 18, John Burke appeared as Aguirre's counsel at a calendar call; on August 7 he moved for a new trial pursuant to Fed.R.Crim.P. 33, alleging that Aguirre's trial counsel had provided ineffective assistance. On October 3, the court granted Aguirre's third request to discharge his counsel and Burke was thereafter replaced by William Mogulescu, who on December 6, 1989 moved for a new trial,

and, in the alternative, petitioned for a writ of error *coram nobis*.

In an affirmation supporting the motion, Mogulescu alleged that Neville had failed to represent Aguirre properly in six ways: by not presenting "readily available" documentary evidence suggesting that the blue Samsonite belonged originally to Orovic; by not calling Aguirre as a witness; by not introducing corroborative evidence; by not calling a chemist to suggest possible reasons for the "slab" condition of the cocaine upon seizure; by not "properly examin[ing]" the called witnesses; and by not requesting a continuance to obtain the testimony of Diaz and Mantilla.

Pursuant to the court's request, Neville responded to the allegations by affidavit. On January 12, 1990, the court heard testimony from Neville and Kirchheimer.

At the end of the hearing, the court orally granted Aguirre's request for a new trial. Although noting that Aguirre's trial attorneys were "dedicated," "conscientious" and "personally involved," Judge Sifton concluded that Aguirre's representation was ineffective. He stated that "no reasonable attorney presented with this evidence concerning the so-called Orovic suitcase would have failed to present some part of that evidence, as much of it as could be presented under the rules of evidence to a jury." He suggested that counsel's decision not to present that evidence was based on "a complete misunderstanding of the standard of relevance" under the Federal Rules of Evidence. Given the proof that Aguirre borrowed a suitcase, the court concluded, the fact that the Orovic suitcase was in the storeroom around the same time "made more probable the proposition ... that the suitcase [Aguirre] brought to New York contained somebody else's drugs, not his."

Judge Sifton's second reason was counsel's failure, for "quite insufficient reasons," to obtain "an express determination by [Aguirre] that he not testify," especially because Neville knew Aguirre "to be somebody passive and not very forthcoming."

Finally, the court concluded that if the jury was aware that the Orovic suitcase had been in the baggage room, it would have "hesitate[d] and quite likely arrive[d] at a different result." The court filed no written opinion.

## II.

Under *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2063–64, a defendant, to establish a claim that his attorney provided ineffective assistance, must prove two things: first, "that counsel's performance was deficient," that is, the attorney "made errors so serious" that the representation fell below "an objective standard of reasonableness," *id.* at 687–88, 104 S.Ct. at 2064; and second, that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt," *id.* at 695, 104 S.Ct. at 2069.

The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," bearing in mind that "[t]here are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689, 104 S.Ct. at 2065. Most important, the attorney's

> strategic choices made after thorough investigation of law and facts relevant to plausible options are *virtually unchallengeable;* and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

*Id.* at 690–91, 104 S.Ct. at 2066 (emphasis added); *see also United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987); *Cuevas v. Henderson*, 801 F.2d 586, 590 (2d Cir.1986) (lack of success of a chosen strategy does not warrant judicial second-guessing), *cert. denied*, 480 U.S. 908, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987).

The ineffectiveness inquiry should focus "on the fundamental fairness of the proceeding whose result is being challenged."

*Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069. The court's central concern is not with "grad[ing] counsel's performance," *id.* at 697, 104 S.Ct. at 2069, but with discerning "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results," *id.* at 696, 104 S.Ct. at 2069.

█ The record amply demonstrates that Neville and Kirchheimer pursued their defense of Aguirre vigorously and diligently. For example, Neville spent more than 100 hours preparing for the trial and, as a fluent speaker of Spanish, conversed with Aguirre and his family in that language throughout the proceedings. In court, Neville made numerous pretrial and trial motions, including one for judgment of acquittal at the close of the Government's case, and received favorable rulings on many of his contentions during trial. This general demonstration of preparation and competence carries significant weight. *See United States v. Cruz,* 785 F.2d 399, 405 (2d Cir.1986) (extensive pretrial work "is quite demonstrative of the reasonableness of counsel's conduct").

### A. *The Orovic Suitcase*

█ By the time the Government rested, Neville and Kirchheimer had made reasonable efforts to explore any evidence that could account for Aguirre's possession of the Samsonite bag and its contents, of which Aguirre said he had no knowledge. Although the district court faulted the attorneys for failing to pursue the Orovic theory, there is nothing in the record to suggest that evidence of the Samsonite's earlier relation to Julia Orovic would have strengthened the defense.

As Neville and Kirchheimer discovered, the theory suffered from many serious deficiencies. First, the testimony of the witnesses necessary to pursue the defense would have disclosed damaging evidence. Carmen Trueba Piedrahita would have testified that, although the Orovic bag and the Samsonite were the same, Aguirre acted suspiciously upon arrival at the Quito airport, especially in not allowing his luggage to undergo a drug inspection. And Luis Peredes might have given harmful testimony because of his perceived hostility toward Aguirre.

Second, based on the interviews with these witnesses, Neville and Kirchheimer entertained serious doubts about the veracity of the Orovic theory. Although the blue Samsonite Aguirre carried had wheels and straps, Germanico Coronel had previously described the Orovic bag as lacking those features. One witness informed Neville that men's clothing had been removed from it in the airline's storeroom, a fact inconsistent with prior ownership by Julia Orovic, a woman. Peredes stated that the Orovic suitcase was not decorated with stickers, unlike the seized suitcase. Moreover, it is difficult to believe that anyone would abandon a bag containing fourteen pounds of cocaine; it is even more difficult to believe that the bag would have been returned to Quito and kept in the airline's storeroom without being detected.

Third, the other available witnesses would have been unable to testify as to the Orovic theory. Magdalena Solorzano told Neville she had no knowledge of the circumstances surrounding Aguirre's borrowing the blue Samsonite in July 1988. Jennie Aguirre knew nothing about the source of the borrowed suitcase other than the fact that Montesdeoca delivered it to their apartment before the Los Angeles flight. And the two employees who were not transported to New York, Pablo Diaz and Diego Mantilla, likewise would not have been able to testify about the suitcase's prior ownership.

As a result, Neville and Kirchheimer were severely restricted in their presentation of evidence. The district court seems to have given no serious consideration to the situation confronting these attorneys in their preparations. Under these circumstances, we cannot fault the decision to call only Jennie Aguirre, Solorzano and Peredes, and to limit the examination of the latter. *See Strickland,* 466 U.S. at 690, 104 S.Ct. at 2065–66 (court "must judge the reasonableness of counsel's challenged con-

duct on the facts of the particular case, viewed as of the time of counsel's conduct"); *Mills v. Scully,* 826 F.2d 1192, 1197 (2d Cir.1987) (not ineffective assistance to forego a defense approach that poses greater risks than benefits). Neville's and Kirchheimer's decisions not to pursue various avenues ancillary to the Orovic defense were made after their initial decision to abandon the defense altogether. Accordingly, the doubts to which they confessed regarding the inadmissibility of some of the evidence pertinent to the defense are immaterial.

We also disagree with the district court's conclusion that the Orovic defense might have caused the jury to reach a different result. From start to finish the telltale evidence was the excessive weight of the Samsonite bag. In summation, the prosecutor argued in part, "How can Mr. Aguirre carry that unusually heavy bag without knowing what was going on? How can someone so accustomed to carrying a similar bag not know?" During deliberations, each juror lifted the suitcase, apparently to determine its weight; moments later, the verdict was announced. Even if counsel encountered no roadblocks in execution of the Orovic theory, such as adverse admissibility rulings or unfavorable revelations from witnesses, the evidence would have failed to counter the jury's reasonable inference that a flight attendant of Aguirre's experience would hardly have carried an excessively heavy bag without having some knowledge of its contents.

Neville and Kirchheimer were faced with a strong Government case that was difficult to defend, a fact that militates against our finding prejudice from any challenged defense tactic. *See United States v. Reiter,* 897 F.2d 639, 645 (2d Cir.1990), *petition for cert. filed,* 58 U.S.L.W. 3787 (U.S. May 31, 1990) (No. 89–1878). Counsel followed a course that, at the time, appeared to be the safest and most effective one available "after thorough investigation of law and facts relevant to plausible options," *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066.

### B. *The Advice that Aguirre not Testify*

For the reasons stated above, Neville advised Aguirre not to testify, and Aguirre did not. Although Judge Sifton did not expressly say so, he implicitly suggested that Neville's advice was unwise by criticizing him for abiding by Aguirre's passive assent instead of obtaining an express waiver. He stated: "It seems to me it is not too much to ask ... that there be an express determination by the client that he not testify, particularly where he has expressed a wish to testify as often as apparently was the case here." We believe, however, that defense counsel is always in a far better position to assess the wisdom of the defendant's testifying than is the trial judge. The record is conclusive proof that such was the case here.

Aguirre defends Judge Sifton's ruling by contending that, as a foreigner inexperienced with the American legal system, he was unaware that he could reject counsel's advice and testify. Moreover, he argues that the issues changing Neville's mind were "trivial" and that Neville "succumbed to panic, excessive cynicism and despair." We disagree.

Because the central issue in this case was whether Aguirre knew the Samsonite bag contained cocaine, the most important strategic decision, beyond a doubt, was whether Aguirre should testify. *See Nersesian,* 824 F.2d at 1321; *United States v. Martinez,* 883 F.2d 750, 755 (9th Cir.1989), *petition for cert. filed* (U.S. May 17, 1990) (No. 89–7539). The dangers of his testifying, in light of the areas of cross-examination available to the Government, were very real. Neville had worked closely with Aguirre and his family for weeks. He knew that the Government could impeach him with the passport inaccuracies. He also had good reason, based on Aguirre's failure of the lie detector test, to believe Aguirre would be a poor witness on his own behalf.

Further, Neville did not coerce Aguirre into following his wishes. Neville, in Spanish, kept Aguirre and his family continually abreast of the preparations. The record is uncontradicted that Neville informed

Aguirre that the decision ultimately was his, that Aguirre listened "intently," and that he "assented" to the advice.

In any event, there is no reason to believe that Aguirre's testimony would have appreciably improved his chances of acquittal. As noted, the Government would have impeached him with the inaccurate passport information. Further, he would have been subject to cross-examination about why he needed three bags instead of one, especially as his wife had packed only enough clothing for a short stay in New York. Above all, he would have had difficulty explaining, given his experience, that he could believe that the bag had merely been reinforced and that he did not know the nature of its contents.

### III.

Our recital of Neville's and Kirchheimer's investigation of the case and their examination of potential witnesses shows the thoroughness of their preparation; it also shows that they were alerted to the dangers in calling some of the airline employees and why they became convinced that Aguirre should not testify. Thus counsel decided to present a limited defense that would permit them to argue that there was nothing to show that Aguirre knew he was carrying fourteen pounds of cocaine.

The question is not whether some other course would have been more successful. That can always be argued after a case has been lost. The question is whether counsel's conduct of the defense was a reasonable course at the time and came within the standards for acceptable representation. We conclude that counsel's conduct was reasonable and within such standards. Aguirre has had a fair trial. One fair trial is all the Constitution guarantees him.

In view of our conclusions about the merits of the ineffectiveness claim, there is no need to address the Government's contention that the district court lacked jurisdiction to grant *coram nobis* relief.

Reversed and remanded for reinstatement of the conviction and sentencing.