**UNITED STATES of America,**

v.

**Dameia O. SMITH.**

**Criminal Action No. 99–445.**
**Civil Action No. 02–7144.**

United States District Court,
E.D. Pennsylvania.

Dec. 2, 2002.

---

Stephen P. Patrizio, Dranoff and Patrizio, P.C., Philadelphia, PA, for Dameia O. Smith.

Dameia O. Smith, Atwater, CA, Pro Se.

John J. Pease, U.S. Attorney, U.S. Attorney's Office, Phila, PA, for United States of America.

## MEMORANDUM

JAN E. DuBOIS, Senior District Judge.

Presently before the Court is defendant's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Under 28 U.S.C. § 2255 (Document No. 123, filed September 4, 2002). For the reasons set forth in this Memorandum, the Court denies defendant's Motion.

## I. *PROCEDURAL HISTORY*

On August 3, 1999, defendant Dameia O. Smith ("Smith" or "defendant") was indicted by a federal grand jury and charged with one count of interference with interstate commerce by armed robbery, in violation of 18 U.S.C. § 1951 (Count One); two counts of use of a firearm in the commission of a crime of violence, in violation of 18 U.S.C. § 924(c) (Counts Two and Six); one count of unauthorized use of a government computer in furtherance of a criminal or tortious act, in violation of 18 U.S.C. § 1030(a)(2)(B) . and § 1030(c)(2)(B)(ii) (Count Three); (c) one count of solicitation to commit a crime of violence, in violation of 18 U.S.C. § 373 (Count Four); one count of attempted murder of a federal witness, in violation of 18 U.S.C. § 1512(a)(1)(C) (Count Five); and one count of intimidation of a federal witness, in violation of 18 U.S.C. § 1512(b)(3) (Count Seven).

The case was tried before a jury from January 18 through 31, 2000. The jury returned a verdict of guilty on Count Three and not guilty on Count Seven. The jury did not reach a verdict on Counts One, Two, Four, Five and Six and the Court declared a mistrial with respect to

those counts. On May 11, 2000, following a second trial, the jury returned a verdict of guilty on the remaining counts, Counts One, Two, Four, Five, and Six.

Defendant was sentenced, *inter alia,* to a term of imprisonment of 481 months on August 24, 2000. The Third Circuit affirmed the conviction and sentence in an unreported opinion dated July 9, 2001, *see United States v. Smith,* 265 F.3d 1057 (Table, No. 00–2557) (3d Cir.2001); defendant's petition for writ of certiorari to the Supreme Court of the United States was denied on October 29, 2001. *See Smith v. United States,* 534 U.S. 1013, 122 S.Ct. 503, 151 L.Ed.2d 413 (2001).

## II. *BACKGROUND*

This case arises out of an armed robbery and defendant's unauthorized use of a government computer during defendant's employment as a tax examining clerk by the Internal Revenue Service ("IRS") in an effort to locate and murder the victim of the robbery to prevent the victim from testifying at defendant's robbery trial. The facts of the case, viewed in the light most favorable to the verdict winner, are summarized below.

On September 6, 1998, Smith robbed Marie Tate ("Tate"), a shift supervisor at a Kentucky Fried Chicken ("KFC") in Philadelphia, Pennsylvania, of $1,887.66 in cash receipts from KFC as she was attempting to make a deposit at a bank in Bala Cynwyd, Pennsylvania. A "shiny, silver" firearm was used in the robbery. Tate knew Smith through a co-worker at KFC, Faiona Hagigal ("Hagigal"), who was one of Smith's girlfriends and the mother of his child.

Approximately two weeks after Smith robbed Tate, the Lower Merion Township Police Department charged Smith with armed robbery. The arrest was based on evidence that Smith used his own ATM card at the location of the robbery nine (9) minutes before the robbery occurred and bank surveillance cameras recorded Smith "wandering around the bank" and then robbing Tate. Resp.'s Br. at 4. In addition, Tate, in an interview with investigators several days after the robbery, gave a description of the robber that was consistent with what Smith was seen wearing on the surveillance tape and stated that she recognized the robber's voice as that of Smith.

At the time the state robbery charges were filed, authorities provided Smith a copy of a probable cause affidavit which referred to an interview with Tate. Shortly thereafter, Smith told another one of his girlfriends and co-worker, Shaquiyyah Jenkins ("Jenkins"), that he had been charged with a robbery and that if Tate was able to identify him in court, "something might happen to her." *Id.*

As a tax examining clerk for the IRS, Smith had access to the IRS's Integrated Data Retrieval System ("IDRS"), a computer database which includes tax and personal information for all taxpayers. The IDRS may only be used by authorized IRS employees for official government tax administration purposes. In June 1998, Smith unlawfully used the IDRS to obtain personal information on Jenkins; this unauthorized access triggered an internal IRS investigation and eventually led to a criminal referral by the IRS to the U.S. Department of the Treasury's Inspector General for Tax Administration ("TIGTA") in November 1998. TIGTA is a federal law enforcement agency charged with investigating and seeking prosecution of IRS employees who commit federal crimes.

On October 7, 1998, eight (8) days before Tate was scheduled to testify against Smith at a preliminary hearing on Smith's state robbery charges, Smith again ac-

cessed the IDRS without authorization and without a legitimate government purpose; this time he utilized the IDRS to obtain Tate's home address and other personal information.

Tate testified against Smith at a preliminary hearing in the Montgomery County Court of Common Pleas on December 14, 1998. At that hearing, Smith's next court appearance was scheduled for February 26, 1999. On January 18, 1999, Smith told Linette Joseph ("Joseph"), another one of his girlfriends, that "he had to go to court on February the 26th, 1999, for robbing a girl at an ATM machine" and that "he was going to kill—kill the girl before they go to court." Trial Transcript, Jan. 24, 2000, at 161 (Testimony of Linette Joseph). At this time, Smith owned a black Smith & Wesson .380 semi-automatic pistol which he showed to both Joseph and Arthur Hart ("Hart"), a friend of Joseph's.

On January 25, 1999, Smith drove with Hart from Baltimore, Maryland, to Tate's home. Smith explained to Hart that the person who lived in the home was a witness against him in a robbery case, handed Hart the .380 semi-automatic pistol, and repeatedly asked Hart to go into the house and shoot Marie Tate (and her mother if she was home). Despite Smith's persistent efforts to persuade Hart to kill Marie Tate, Hart refused and Smith's subsequent urging of Hart to reconsider failed. Later that same evening, Smith told Hart that, because Hart refused to kill Tate, Hart would have to "help" Smith rob a bank; Hart agreed to Smith's demands and participated in an attempt to rob a bank outside of Philadelphia on January 27, 1999. This attempt failed, but Hart and another individual were captured by police shortly thereafter and immediately began cooperating with authorities.

By January 29, 1999, a second federal investigation by TIGTA into Smith's involvement in the KFC robbery and his unauthorized use of an IRS computer had begun. Soon afterwards, federal agents determined that Smith unlawfully used the IDRS to obtain Tate's home address and began to interview witnesses in connection with that crime and the KFC robbery.

On February 5, 1999, Smith was arrested in Baltimore and charged with illegal possession of a weapon. The firearm taken from Smith's car by police on February 5, 1999, was the same gun that Smith handed to Hart in his unsuccessful attempt to convince him to murder Tate on January 25, 1999.

In his habeas motion, Smith claims relief on the following grounds: (1) his trial counsel was constitutionally ineffective because he recommended that Smith not testify at trial; (2) his separate convictions for using a firearm in the course of two violent crimes should be set aside because the government failed to produce the gun allegedly used in the armed robbery, and the other firearm introduced in evidence in connection with the attempted murder charge was seized by police before that crime was committed; (3) his conviction for attempted murder under the federal witness tampering statute should be set aside because Tate was not a federal witness until after the alleged attempted murder; and (4) the government lacked jurisdiction to prosecute the armed robbery. The Court will address these arguments in turn.

## III. *DISCUSSION*

### A. Claimed Ineffective Assistance of Counsel—Counsel's Recommendation that Defendant Not Testify at Trial

Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), it is well-settled that, to establish a

claim of ineffective assistance of counsel at trial, a convicted defendant must demonstrate that his counsel's performance (1) "fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. 2052, and (2) that counsel's deficient performance prejudiced the defendant. *Id.* at 692, 104 S.Ct. 2052. As articulated by the Supreme Court in *Strickland,* "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052. The ultimate focus of the *Strickland* inquiry is always on the "fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696, 104 S.Ct. 2052.

The Court, in evaluating whether counsel's performance fell below an objective standard of reasonableness, must determine "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. 2052. In this analysis, the Court must be "highly deferential," and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052. The Court must not use the benefit of hindsight to second-guess strategic decisions made by counsel unless they are unreasonable. *Id.* at 690, 104 S.Ct. 2052.

As to the *Strickland* prejudice prong, the Court's inquiry must focus on whether defendant has demonstrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Smith claims that his trial counsel was ineffective for recommending to him that he not testify at trial. Smith asserts that he "wanted to take the stand, but [his] lawyer said it was a bad idea." Pet.'s Mtn. at 5. For the reasons set forth below, the Court denies Smith's claim of ineffective assistance of counsel on this ground.

 "It is well established that the right of a defendant to testify on his or her behalf at his or her own criminal trial is rooted in the Constitution." *United States v. Pennycooke,* 65 F.3d 9, 10 (3d Cir.1995). "The right is personal and can be waived only by the defendant, not defense counsel." *United States v. Leggett,* 162 F.3d 237, 245 (3d Cir.1998), *cert. denied,* 528 U.S. 868, 120 S.Ct. 167, 145 L.Ed.2d 141 (1999) (citing *Pennycooke,* 65 F.3d at 10). When a defendant chooses not to testify, the decision is "an important part of trial strategy best left to the defendant and counsel" and not something that should be interfered with by the court. *Pennycooke,* 65 F.3d at 11. Although it is the duty of defense counsel to inform defendant of his right to testify, the decision itself is ultimately that of the defendant. *Id.* at 12; *see also Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("[T]he accused has the ultimate authority to make certain fundamental decisions regarding the case, [including] as to whether ... to testify in his or her own behalf.").

 Where a defendant is aware of and understands his right to testify, however, counsel's alleged failure to call the defendant to the stand does not constitute ineffective assistance of counsel. *See United States v. Castillo,* 14 F.3d 802, 804–05 (2d Cir.1994) (concluding that defendant was not denied his right to effective assistance of counsel where defendant had been advised of his right to testify in the first trial,

but was dissuaded from testifying by counsel in the second trial); *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir.1992) (holding that defense counsel's decision not to call defendant to the stand, despite defendant's repeatedly expressed desire to testify on his own behalf, was not ineffective assistance of counsel, but was a "reasonable tactical decision" by counsel not to "subject [defendant] to all of the risk attendant on cross-examination"); *United States v. Aguirre*, 912 F.2d 555, 562–63 (2d Cir.1990) (ruling that there was no ineffective assistance of counsel where counsel "informed [defendant] that the decision [to testify] ultimately was his, that [defendant] listened 'intently,' and that he 'assented' to the advice").

■ To prevail on an ineffective assistance claim premised on trial counsel's alleged refusal to allow a client to testify, the petitioner must do more than just assert that his lawyer refused to allow him to testify. "It is extremely common for criminal defendants not to testify" and a defendant merely claiming that he was denied the right to testify in his own defense is thus "too facile a tactic to be allowed to succeed." *Underwood v. Clark*, 939 F.2d 473, 475 (7th Cir.1991). "[I]n a subsequent collateral attack on the conviction the defendant must produce something more than a bare, unsubstantiated, thoroughly self-serving, and none too plausible statement that his lawyer (in violation of professional standards) forbade him to take the stand." *Id.* at 476.

■ In this case, there is no evidence of record that Smith desired to testify on his own behalf and was prevented from doing so by his lawyer. The issue was first raised in the presence of the Court during a sidebar conference after the government rested in the first trial, as follows:

"THE COURT: ... Before we let [the jury] go, we've got to tell them what we're going to do tomorrow.

DEFENSE COUNSEL: We're either going to put on a case or not and if we don't, then we'll go to closing.

THE COURT: Are you going to offer any evidence or not?

DEFENSE COUNSEL: I don't know. I've got to—if my [client]—my [client] says he wants to testify, but I would like to spend the night trying to convince him not to testify. That's my humble opinion, but he's a man of his own opinion and I would just like to have him colloquied that if he's going to testify then it's against my advice ..."

Trial Transcript, January 24, 2000, at 187–88. After a weekend break in the trial, the defense introduced defendant's bank statements into evidence and then rested. Smith did not take the witness stand in the first trial. *See* Trial Transcript, January 27, 2000, at 54.

During the retrial of May 2000, defense counsel suggested, in the presence of defendant, that the Court determine on the record whether or not the defendant wanted to testify. *See* Trial Transcript, May 10, 2000, at 111, 116–17. Relying on the Third Circuit's decision in *Pennycooke*, which concluded that "it is inadvisable for a court to question a defendant directly about his or her waiver of the right to testify," *Pennycooke*, 65 F.3d at 11, the Court declined to conduct a colloquy on Smith's decision not to testify. Trial Transcript, May 10, 2000, at 117. However, the Court did make Smith fully aware of his constitutional right to testify in his own defense:

"THE COURT: ... The defendant has certain rights during the trial and I won't enumerate all of them but one of them is the right to testify or to refuse to testify ... These are issues on which

you should have full and frank discussion with your attorney and then you should decide, based on what your attorney tells you and what you think is right under all the circumstances after hearing from your attorney and I'm not going to advise you one way or another." *Id.* at 117–18. Following this statement by the Court and brief testimony from another witness, defendant rested without testifying at the second trial. *See id.* at 129–30.

The record clearly demonstrates that Smith was made aware of his right to testify and chose not do to so. It is also undisputed that Smith and his attorney were instructed that the decision whether or not to testify was Smith's alone. That is all the law requires. Smith has failed to overcome the presumption that counsel's advice that Smith not take the stand was "sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Smith's claim of ineffective assistance of counsel on this ground is simply a "barebones assertion," insufficient to warrant habeas relief. *Underwood*, 939 F.2d at 476.

## B. Defendant's Challenges to His Separate Convictions for Using a Firearm in the Course of Two Violent Crimes

Smith claims that, although he was convicted of two separate counts (Counts Two and Six) of using a firearm in the commission of a crime of violence—each involving a separate gun—the government recovered only one of the firearms. It is correct that the black .380 semi-automatic pistol Smith handed to Hart in the attempted murder of Tate was the only gun the government offered in evidence at trial, and that the "shiny, silver" gun used by Smith in the Tate robbery was never recovered. Because the "shiny, silver" firearm was not produced, Smith contends

that his conviction for use of that firearm in connection with the robbery must be set aside.

Smith also alleges that the .380 semi-automatic pistol allegedly used in the attempted murder on January 25, 1999, was actually recovered by the Baltimore police on January 5, 1999, twenty (20) days before the attempted murder. That argument is based on the fact that the tag on the firearm in the custody of the Baltimore police was dated January 5, 1999. Smith failed to raise these firearm claims on direct appeal of his conviction and sentence.

■■■■ A motion under 28 U.S.C. § 2255 cannot be used as a substitute for a direct appeal. *See Government of the Virgin Islands v. Nicholas*, 759 F.2d 1073, 1074 (3d Cir.1985). "The type of claim cognizable under [a § 2255] motion is extremely limited." *Eisenfelder v. United States*, 871 F.Supp. 793, 796 n. 8 (M.D.Pa. 1994). A petitioner is barred from collaterally attacking his sentence pursuant to § 2255 so far as that attack is based on issues that could have been, but were not, raised on direct appeal. *See United States v. Frady*, 456 U.S. 152, 162–63, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *United States v. Essig*, 10 F.3d 968, 978 (3d Cir.1993). To avoid the bar, defendant must prove both (1) "cause" excusing his failure to raise the issues earlier, and (2) "actual prejudice" resulting from his failure to do so. *See Frady*, 456 U.S. at 168, 102 S.Ct. 1584; *Essig*, 10 F.3d at 978–979. "Cause" must be objective—something external to the petitioner, something that cannot be fairly attributed to him. *See Coleman v. Thompson*, 501 U.S. 722, 751, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). The "actual prejudice" must be so substantial that the integrity of the entire trial is infected. *Frady*, 456 U.S. at 169–70, 102 S.Ct. 1584. There-

fore, unless petitioner can show "cause" for his procedural default and "actual prejudice" from it, these issues are waived. *Id.* at 167, 102 S.Ct. 1584.

Smith could have, but did not, raise his firearm claims on direct appeal. In his motion, he provided no explanation for his failure to raise these claims. Accordingly, the Court concludes that Smith has not satisfied his burden of showing cause that excuses this procedural default, and the firearm claims are deemed to be waived. *See id.* at 162–63, 102 S.Ct. 1584; *Essig,* 10 F.3d at 979. Notwithstanding this conclusion, the Court will address defendant's firearm claims on the merits in turn.

 1. Defendant's Argument That His Conviction for Using a Firearm in the Course of a Robbery Should Be Set Aside Because the Government Failed to Produce the Gun Allegedly Used in That Crime

■■■ This firearm issue raised by defendant was rejected by the Third Circuit in *United States v. Beverly,* 99 F.3d 570 (3d Cir.1996). In that case, the defendant was charged with two counts stemming from an armed robbery of a postal letter carrier. On appeal, the defendant challenged the sufficiency of the evidence to convict him of using a firearm in the commission of a violent crime—the "chrome-plated" revolver allegedly used by the defendant was never recovered and the only evidence presented regarding the firearm charge was the testimony of the robbery victim. *Id.* at 571. The victim testified that he saw the gun on two different occasions—when the defendant first stopped him and while riding in the back seat of the defendant's car—and that he was in "close proximity to [the defendant] while [defendant] brandished the weapon." *Id.* at 573. The Third Circuit held that the victim had "ample time to view the weapon

while he was in the defendant's car," and that his testimony provided sufficient evidence for a jury to conclude that the defendant utilized a firearm in the commission of the robbery. *Id.*

In this case, two witnesses testified that they saw Smith in possession of a "shiny, silver" firearm—Tate testified that the firearm Smith used in the course of robbing her was a "shiny, silver" handgun; Jenkins testified that she often saw Smith carrying a "silver" semi-automatic pistol. The testimony of Tate and Jenkins is sufficient evidence to support Smith's firearm conviction under 18 U.S.C. § 924(c). *See id.; see also Parker v. United States,* 801 F.2d 1382, 1383 (D.C.Cir.1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 964, 93 L.Ed.2d 1011 (1987) (upholding a conviction under 18 U.S.C. § 924(c) arising out of a bank robbery where the gun was never recovered and the only evidence offered by the government as to its existence was the testimony of two bank employees that the defendant carried a gun with which he threatened to "blow their heads off").

As stated above, petitioner failed to raise this firearm claim on direct appeal and he has not shown cause for this procedural default. Moreover, because the claim is without merit, petitioner has failed to show prejudice. This argument for § 2255 relief is thus denied.

 2. Defendant's Argument that the Conviction for Using a Firearm in an Attempted Murder Should be Set Aside Because the Firearm He Allegedly Used in the Attempt was Seized by Police Before the Attempted Murder

■■■ Defendant's second firearm claim also is without merit. The evidence presented at trial established that Smith was arrested on February 5, 1999, and that .380 semi-automatic pistol introduced in

evidence was found in Smith's car on that date. Baltimore Police Officer Shawn Johnson, who arrested Smith and recovered the firearm on February 5, 1999, testified at length during the retrial of May 2000 that the reference to the January 5, 1999 date on the firearm tag was a typographical error, and that the arrest and seizure of the weapon occurred on February 5, 1999. *See* Trial Transcript, May 10, 2000, at 93–95, 99–106 (Testimony of Shawn Johnson). Accordingly, this firearm claim does not provide a basis for habeas relief.

**C. Defendant's Argument That His Conviction for Attempted Murder Under the Federal Witness Tampering Statute Should be Set Aside Because Tate was Not a Federal Witness Until After the Alleged Attempted Murder**

Smith claims that Tate was not a federal witness until March 13, 1999, several weeks after the attempted murder. Accordingly, he argues he cannot be convicted of attempting to murder a federal witness. This claim was raised by Smith on direct appeal of his sentence and conviction, and rejected by the Third Circuit in an unpublished opinion on July 9, 2001.

 Section 2255 may not be employed to relitigate questions, on collateral attack, which were raised and rejected on direct appeal. *United States v. DeRewal*, 10 F.3d 100, 105 & n. 4 (3d Cir.1993); *see also United States v. Orejuela*, 639 F.2d 1055, 1057 (3d Cir.1981) ("Once a legal argument has been litigated and decided adversely to a criminal defendant at his trial and on direct appeal, it is within the discretion of the district court to decline to reconsider those arguments if raised against in collateral proceedings under 28 U.S.C. § 2255.").

 The Third Circuit has identified four exceptions to this general rule: (1) newly discovered evidence that could not reasonably have been presented at the original trial; (2) a change in applicable law; (3) incompetent prior representation by counsel; or (4) other circumstances indicating that an accused did not receive full and fair consideration of his federal constitutional and statutory claims. *United States v. Palumbo*, 608 F.2d 529, 533 (3d Cir.1979). Defendant's claim as to Tate's status under the federal witness tampering statute does not fall into any one of the four categories of claims which may be re-litigated in the Third Circuit under *Palumbo*. *Id.; see also United States v. Swint*, 2000 WL 987861, at *17, Crim. No. 94–276, Civ. No. 98–5788 (E.D.Pa. July 17, 2000).

Notwithstanding this determination, the Court will address the merits of this claim, which it rejects. To convict under 18 U.S.C. § 1512(a)(1)(C) for attempting to murder a federal witness, the Third Circuit in *United States v. Stansfield*, 101 F.3d 909 (3d Cir.1996) ("*Stansfield I*"), held that "the government must prove: (1) the defendant killed or attempted to kill a person; (2) the defendant was motivated by a desire to prevent the communication between any person and law enforcement authorities concerning the commission or possible commission of an offense; (3) the offense was actually a federal offense; and (4) the defendant believed that the person in (2) above might communicate with federal authorities. The last element may be inferred by the jury from the fact that the offenses were federal in nature, plus appropriate evidence." *Id.* at 918.

In *United States v. Bell*, 113 F.3d 1345 (3d Cir.1997), *cert. denied*, 522 U.S. 984, 118 S.Ct. 447, 139 L.Ed.2d 383 (1997), the Third Circuit held that "the law of this circuit after *Stansfield [I]* is that the

government must prove that at least one of the law-enforcement-officer communications which the defendant sought to prevent would have been with a federal officer, but that *the government is not obligated to prove that the defendant knew or intended anything with respect to this federal involvement." Id.* at 1349 (emphasis added). The court thus interpreted the last element of the *Stansfield I* test—that the government must prove that the defendant believed the witness might communicate with federal authorities—as requiring the government to prove only that the officers with whom the defendant believed the victim might communicate would turn out to be federal officers, not that the defendant knew or believed the officers were federal officers. *Id.; see also United States v. Applewhaite,* 195 F.3d 679, 687 (3d Cir.1999) ("One who attempts to corruptly influence an investigation takes his or her witness and investigations as he or she finds them. Thus, if the investigation or prosecution a defendant tries to hamper *turns out to be federal,* the [defendant] is guilty of tampering with a federal witness . . .") (emphasis added).

Furthermore, in *United States v. Stansfield,* 171 F.3d 806 (3d Cir.1999) ("*Stansfield II* "), the court concluded that the following jury instructions given by the district court "were consistent with our statement of the law in *Stansfield I* and *Bell* ":

> [T]he Government must prove beyond a reasonable doubt that [the witness] *might* have communicated to law enforcement authorities information concerning a federal offense and that the Defendant was motivated by a desire to prevent that communication. . . .
>
> In fact, *there need not be an ongoing federal investigation or even any intent on the part of federal authorities to in-*

*vestigate. Nor must the Government prove that the Defendant knew or believed that the offense was a federal offense.* Although, you may consider the fact that the offense is a federal offense in determining whether there might be communication with federal authorities.

*Id.* at 816 n. 8, 817 (emphasis added).

The defendant in *Stansfield II* challenged his conviction under 18 U.S.C. § 1512 because the government did not introduce evidence that he "knew of any pending investigation or that federal officers would ever be involved." *Id.* at 817. The *Stansfield II* court dismissed this assertion as irrelevant and concluded that the underlying offenses were "clearly" federal offenses—mail fraud, using arson to commit mail fraud, and money laundering—and that there was sufficient evidence to support a conviction under the federal witness tampering statute:

> The evidence reflected that [the witness] had already cooperated several times with *state* authorities and with [Stansfield's insurer]. Stansfield had knowledge of [the witness's] past cooperation and was aware that some investigation, *though not necessarily a federal one,* was underway. Moreover, though it is unclear whether Stansfield was aware of it, the evidence also showed that federal authorities had begun an investigation approximately one month prior to the conduct in questions. Given that Stansfield violated several federal laws and based on the actions he took thereafter, a jury could reasonably find beyond a reasonable doubt that the attack [on the witness] was motivated, at least in part, by Stansfield's belief that [the witness] *might* cooperate with federal authorities.

*Stansfield II,* 171 F.3d at 817 (quoting *Stansfield I,* 101 F.3d at 919) (emphasis added).

The Court will now address the four elements of the *Stansfield I* test in the context of this case.

■■■ The first element of *Stansfield I* requires the government to prove that Smith attempted to murder Tate. The Court concludes that the government introduced ample evidence on this issue— including Hart's testimony that on January 25, 1999, Smith handed him a firearm and urged him to murder Tate in her home; the .380 semi-automatic pistol recovered from Smith's car on February 5, 1999; and Hart's testimony identifying the pistol as the same firearm given to him by Smith in the solicitation of Tate's murder—for a jury to reasonably conclude that Smith attempted to murder Tate on January 25, 1999.

The government also produced sufficient evidence to meet its burden under the second element—that Smith solicited Tate's murder because he wanted to prevent her from cooperating with authorities regarding the armed robbery. Joseph testified that on January 18, 1999, Smith told her "he had to go to court on February the 26th, 1999, for robbing a girl at an ATM machine" and that "he was going to kill— kill the girl before they go to court." *Id.,* Jan. 24, 2000, at 161 (Testimony of Linette Joseph). Hart testified that on January 25, 1999, Smith asked him to kill Tate because she "was going to cause him some problems" and he "didn't want her to tell about the [robbery]." Trial Transcript, Jan. 24, 2000, at 105–06 (Testimony of Arthur Hart). Jenkins testified that, shortly after Smith was arrested for armed robbery in September 1998, he told her that if Tate identified him in court, "something might happen to her;" she understood this to be a "threat." *Id.,* Jan.

21, 2000, at 128, 130 (Testimony of Shaquiyyah Jenkins). Detective Richard Birkenmeier testified that in his investigation of the armed robbery he prepared a probable cause affidavit which referred to an interview with Tate, and gave a copy of the affidavit to Smith following his arrest in September 1998. *Id.,* Jan. 20, 2000, at 202 (Testimony of Richard Birkenmeier). Based on the testimony of these witnesses, and the fact Tate testified against Smith at a preliminary hearing on December 14, 1998, a jury could reasonably find that Smith was aware of Tate's cooperation with law enforcement officials and that he solicited her murder on January 25, 1999, to prevent further cooperation.

To meet the third element, the government must establish that the offense committed by Smith—interfering with interstate commerce by armed robbery—is actually a federal offense. As discussed in more detail below, *see infra* III.D., Smith's armed robbery of Tate, as she was attempting to deposit cash receipts from KFC, was a federal crime. *See* 18 U.S.C. § 1951. The Court also notes that the unauthorized use of a government computer in furtherance of a crime is a federal felony. *See* 18 U.S.C. § 1030(c)(2)(B)(ii).

■■■ With regard to the fourth element—that Smith believed Tate might communicate with federal authorities—"a jury can consider the fact that [it was] a federal offense in determinating whether there might be communication with federal authorities," although the government need not prove that Smith knew or believed that his armed robbery was a federal offense. *Stansfield II,* 171 F.3d at 816 n. 8.

The evidence established that Tate began cooperating with law enforcement authorities several days after the armed rob-

bery of September 6, 1998, more than four months before the attempted murder. The testimony of Joseph, Hart, Jenkins, and Birkenmeier, and Tate's testimony against Smith at his preliminary hearing in December 1998, evidences Smith's knowledge of Tate's cooperation and his awareness that "some investigation, though not necessarily a federal one, was underway." *Id.* at 817. Moreover, the evidence also showed that in November 1998, federal TIGTA agents had begun an investigation into Smith's access of the IDRS to obtain information on Jenkins, and interviewed Smith and other witnesses in connection with this investigation. In fact, several days after Smith's solicitation of Tate's murder, a second TIGTA investigation into Smith's involvement in the KFC robbery and his unauthorized use of an IRS computer had begun. Furthermore, Jenkins testified she and Smith took training classes in March 1998, at the beginning of their employment with the IRS, in which they were instructed that the unauthorized use of the IDRS is a federal crime. *See* Trial Transcript, Jan. 21, 2000, at 115–16, 119–120 (Testimony of Jenkins). Given this evidence and the fact that Smith committed two federal offenses involving Tate—interfering with interstate commerce by armed robbery and the unlawful use of a government computer to obtain Tate's address—"a jury could reasonably find beyond a reasonable doubt that the [attempted murder of Tate] was motivated, at least in part, by Smith's belief that [she] might cooperate with federal authorities." *Stansfield II,* 171 F.3d at 817 (quoting *Stansfield I,* 101 F.3d at 919).

The Court concludes the government provided sufficient evidence from which a jury could find that the government satisfied each of the four elements set forth in *Stansfield I.* Accordingly, Smith's contention that, at the time of the attempted murder, Tate was not a federal witness for purposes of the federal witness tampering statute is without merit.

### D. Defendant's Argument That The U.S. Government Lacked Jurisdiction to Prosecute the Robbery

■ Section 2255 provides, *inter alia,* that a petitioner may challenge his sentence on the basis that "the [sentencing] court was without jurisdiction to impose such sentence ..." 28 U.S.C. § 2255. In this case, Smith claims that the government did not have jurisdiction to prosecute the armed robbery under 18 U.S.C. § 1951, which makes it a crime for anyone who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so." Smith asserts that "[t]he only reason the Government took the case was because I was a IRS worker." Apparently, Smith is attempting to argue—as his defense counsel did by motion in the first trial of January 2000—that there was insufficient evidence of an interstate nexus to sustain a conviction under 18 U.S.C. § 1951. The Court rejected that argument in the first trial because the government introduced evidence sufficient to demonstrate an effect on interstate commerce. That argument is again rejected for the same reason.

The trial record established the following: (1) Smith robbed Tate of cash deposits from a KFC restaurant owned by a Kentucky corporation; (2) all food sold in the restaurant originated outside Pennsylvania; (3) all expenses of the restaurant, except for incidentals, were paid for by the out-of-state parent corporation; and (4) all cash receipts of the restaurant were deposited at a bank and then immediately transferred to other out-of-state accounts controlled by the Kentucky corporate parent

for purchasing supplies from out-of-state vendors.

These facts demonstrate that the robbery of KFC's cash receipts that Tate attempted to deposit interfered with the movement of restaurant funds in the stream of interstate commerce and affected the restaurant's financial ability to make purchases from out-of-state suppliers. Thus, the Court concludes that there was a sufficient interstate nexus to create federal jurisdiction over the offense. *See United States v. Nguyen,* 155 F.3d 1219, 1224–25 (10th Cir.1998), *cert. denied,* 525 U.S. 1167, 119 S.Ct. 1086, 143 L.Ed.2d 87 (1999) (holding that the "requisite effect on interstate commerce" for a 18 U.S.C. § 1951 conviction is demonstrated by, *inter alia,* evidence that restaurant robbed by defendant had often purchased food products from out-of-state vendors and that the money taken by defendant would have been used to buy more food products); *United States v. Miles,* 122 F.3d 235, 236–37, 241 (5th Cir.1997) (finding sufficient interstate commerce nexus of three McDonald's restaurants robbed by defendant because they "were company-owned stores that purchases many of their ingredients and supplies from out-of state locations," paid employees with out-of-state funds, and transferred their proceeds to an out-of-state location); *United States v. Harrington,* 108 F.3d 1460, 1469 (D.C.Cir.1997) (upholding a 18 U.S.C. § 1951 conviction on the ground that "a jury could securely conclude that this robbery removed over thirty dollars from the restaurant's cash receipts and prevented another several hundred or a thousand dollars from coming in, and that this missing money would, in the first series of interstate transactions, definitely have been deposited in a[n] [out-of-state] bank; after that some of it would undoubtedly be used by the restaurant's [out-of-state] parent company to purchase supplies and ser-

vices for the restaurant from [other states]").

## IV. *CONCLUSION/CERTIFICATE OF APPEALABILITY*

For the foregoing reasons, the Court denies Smith's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody.

■ Upon the denial of a 28 U.S.C. § 2255 motion by the district court, an appeal to the Court of Appeals is not permitted unless the petitioner obtains a certificate of appealability. 28 U.S.C. § 2253. "At the time a final order denying a petition under 28 U.S.C. § 2255 is issued, the district judge shall make a determination as to whether a certificate of appealability should issue." Third Circuit Local Appellate Rule 22.2. The application for such a certification should first be made to the district court. *See United States v. Williams,* 158 F.3d 736, 742 n. 4 (3d Cir. 1998) (stating that "as a matter of practice ... an unsuccessful movant in a § 2255 case should in the first instance seek a certificate of appealability from the district court").

■ The law permits the issuance of a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In order to establish the denial of a constitutional right, the mere allegation of a constitutional wrong, such as deprivation of the rights to effective counsel, is insufficient; the petitioner must make a substantial showing of such an error in order to present an appeal. *Santana v. United States,* 98 F.3d 752, 757 (3d Cir.1996). "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."

*Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

For the reasons set forth in this Memorandum, Smith has not made the requisite showing of a denial of a constitutional right. Therefore, the Court declines to issue a certificate of appealability.

### ORDER

**AND NOW,** this 2nd day of December, 2002, upon consideration of Defendant's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Under 28 U.S.C. § 2255 (Document No. 123, filed September 4, 2002), and the related submissions of the parties, for the reasons set forth in the attached Memorandum, **IT IS ORDERED** that Defendant's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Under 28 U.S.C. § 2255 is **DENIED.**

**IT IF FURTHER ORDERED** that a certificate of appealability will not issue on the ground that petitioner has not made a substantial showing of a denial of a constitutional right as required under 28 U.S.C. § 2253(c).